### In July Term, A. D. 1842, being the sixty-sixth year of our Independence.

---

## NICKS' HEIRS AND OTHERS vs. RECTOR.

In equity, matters of practice are within the discretion of the Chancellor, and if any error or mistake is committed by him, it cannot be taken advantage of in this Court on appeal, especially when such questions do not enter seriously into the merits of the decree.

This Court is not authorized to reverse a decree upon mere questions of practice, unless the Chancellor has expressly violated some important principle of equitable jurisprudence, or disregarded some plain and authoritative command of the statute upon that subject.

The rigid application of the rules of English practice to our Courts, would, in many cases, be wholly impracticable, and, if allowed, would work most manifest injustice and wrong.

The Chancellor, upon the hearing, has power to permit a commission, under which testimony has been taken, to be amended, by filling up the blank direction with the words, " to any Judge or Justice of the Peace," &c. For the commission is nothing more than the process of the Court, which may, at any time, be amended in an unimportant point, on suggestion.

It is not necessary, under our statute, for exhibits referred to in a deposition, to be attached to, and returned with it, in a case where they are made a part of the bill, and filed with it. All the statute requires is, that the exhibits should be identified and their execution proved.

Under our statute, the power is expressly given the Chancellor to permit an exhibit to be proved *viva voce* at the hearing, provided the party is not taken by surprise, or any serious wrong committed thereby.

And in case of an exhibit attached to the bill, and there being no pretence that the other party had not a fair opportunity, if he desired, of questioning its genuineness, it may be proved *viva voce*, without any previous order or notice.

And permitting such exhibit to be so proven, is, at any rate, matter of *practice*, of which no advantage can be taken on appeal.

Nicks' Heirs et al. vs. Rector.

Where it was proven that a subscribing witness to an instrument had gone to another State four years before, that nothing more had been heard of him, and he was supposed to be dead, this proof being uncontradicted, his hand-writing was properly permitted to be proven.

Although parts of the contents of a paper read on the hearing may be irrelevant, yet it cannot be presumed that such matter could have had any influence on the mind of the Chancellor, nor could it exclude other portions, relevant and legal.

The seal of the General Land Office, and the signature of the Commissioner to copies of original papers required by law to be deposited in his office, *prima facie* prove themselves; and such copies are competent evidence in our Courts.

Where by one paper signed by both, A. sells B. his improvement on the public lands, and gives him authority to locate the same with a donation claim, the land, when so located, to be for the joint benefit of both, and to be divided in a certain manner; and by a note of the same date, B. promises to pay A. a certain sum, by a day certain, as the price of his improvement, on the condition that B. should by that day secure the same land by a donation claim; the two instruments in law constitute one entire contract.

The rule of law is, that where a transaction is evidenced by two papers, the connection between which is established by their contents, without any necessity of referring to other matter to connect them together, they will be taken as an entire agreement.

In all agreements there must be a mutuality of obligation upon the respective parties, to render them obligatory; and a court of equity will never decree a specific performance, unless the remedies are mutual, or where one party only is bou   perform.

As B., therefore, could avoid the payment of the note by deferring the location; consequently, on his failure to make the location by the day fixed, the authority given to him expired, and the obligation on him to pay the money also expired at the same time.

The clause in the act of Congress of 6th January, 1829, providing that any location of a donation claim on the improvement of any actual settler, before the same should have been offered for sale, without the consent of such actual settler, should be null and void, creates a mere personal privilege or protection to the actual settler.

If by any means the settler transferred this right or privilege, or signified his consent to the location, it would be a mere waiver of his privilege, and perhaps a personal covenant that would bind him so long as he continued to reside on the land. It might be made to operate by way of an equitable estoppel, and probably could not be revoked, if in terms absolute and unconditional; it would be otherwise, if in terms conditional, and limited to a particular time.

Such agreement would be binding as long as he remained upon, and in possession of the land; if he voluntarily abandoned the land, his consent to the location was of no avail.

Such a license to locate, given by the actual settler, does not create a power coupled with an interest, nor is it irrevocable.

A power, coupled with an interest, must be engrafted on an estate in the thing. The interest must be an interest in the thing itself, and the power and the interest must be united in the same person. It is not a power, by the exercise of which the estate is to be created; for in such case, the power, to produce the interest, must be exercised, and by its exercise is extinguished. The power ceases when the interest commences.

Where an actual settler gave another person a license to locate the land with a donation claim, within a time certain, he did not thereby constitute that person his agent although the land was to be located for the joint advantage of both.

And when, after such time expired, the actual settler sold to others, who settled on the land, there were no equal equities, as between them and the original purchaser, The principle as to equal equities did not apply.

A., the first actual settler, had neither a legal or equitable interest in the land. He had a mere inchoate and imperfect right of possession, good against all the world except the United States, but only good so long as he continued on the land.

And where B., the person to whom he originally gave a license to locate the land, entered the same with a donation claim, after the time agreed on had expired, after

Nicks' Heirs et al. *vs.* Rector.

A. had sold all his right to D. and C., and removed from the land, leaving them the only actual settlers upon it; such location, without the consent of D. and C., was *in fraudem legis*, and wholly null and void.

And it makes no difference if D. and C. had notice of the original contract between A. and B.

The decisions of the Register and Receiver, under the pre-emption and donation laws, are conclusive as to all matters within their jurisdiction, in the absence of fraud. Thus, under the donation law, as to the facts of the settlement in the country ceded to the Cherokees, and the removal from it, by the claimant, necessary to entitle him to his donation, the decision of those officers was conclusive, because to decide these facts appertained strictly to their jurisdiction. But if they undertook to decide that the improvement of an actual settler and pre-emption claimant had been legally located by a donation claim, then they were deciding in a matter entirely beyond their jurisdiction.

The person entering a donation claim, located it at his peril. If he located it on lands occupied and improved by an actual settler, and without his consent, such location is null and void, and the settler relievable in equity. And the entry being void, the patent issued upon it confers no title.

In such case, the actual settler, especially if having a valid pre-emption claim, is entitled to a decree for ever quieting his possession against the patent.

And, such entry being void, if the actual settler has a valid pre-emption claim, and has in due time proven it up, and tendered to the proper officer the purchase money, he or his assignee has a vested, legal, and equitable right, equivalent to an interest in the land.

The rule in regard to a tender is, that if a debtor offers to produce the money, and its production is dispensed with by the creditor, the tender is sufficient, without the money being actually produced; and this rule holds under the land laws, in case of an application to enter land.

And not only the pre-emptor himself, claiming under the pre-emption act, but his assignee, to whom he assigned subsequently to January, 1832, may proceed in equity to have his possession quieted in such case. Such an assignment was contrary neither to the letter or policy of the law; and one who was prevented from purchasing, by the fraud of a third person, and the dereliction of duty and negligence of the officers of the United States, could dispose of his interest as fully as one who had actually been allowed to purchase and enter his land.

HARVARD SCHOOL LIBRARY

This was a suit in Chancery, determined in Crawford Circuit Court, in September, 1841, before the Hon. Richard C. S. Brown, one of the Circuit Judges. Rector filed his bill in 1839, in which he stated, that, in December, 1828, or early in January, 1829, William Duval and Peter A. Carns, then partners, rented of William Morse a log-house, then and for some time before occupied and in the possession of Morse, standing on the north-east fractional quarter of section 8, in T. 8 N., R. 32 W., in the county of Crawford, which tract Morse was then occupying and living on, improving, and cultivating, as an actual settler. That Duval & Carns then took possession of the house, and occupied it as a store-house, and thence continued to have the exclusive occupancy and possession of it. That, by two instruments of writing, executed by Morse, one on the 29th of June, 1829, and the other on the 29th of July, 1829, Morse, for a valuable con-

Nicks' Heirs et al. *vs.* Rector.

sideration, sold and transferred to Duval & Carns all his right, title, interest, and claim, of, in, and to, the tract of land, as a settler and occupant thereon, and all his improvement, reserving the privilege of taking off the crop then growing; and Duval & Carns then obtained full possession of the land, subject only to that reservation; and so ceased to be tenants of Morse, and became the sole occupants of the land, and exclusive owners of the improvements on it. That Duval & Carns, in 1829, dug a well on the land, cleared part of the land, and cultivated it in turnips, and built and enclosed a house on it; and thence continued, up to 1833, to hold, occupy, and own, the improvements on the land, the same being public land of the United States; and, as such actual settlers and cultivators, became entitled to a preemption right on the land, under the act of 1830. That the tract contains 136 acres. That, on the 21st of January, 1829, Morse and one John Nicks, since deceased, entered into an agreement, in writing, in which it was stipulated that Nicks should be allowed, on or before the 15th of May, 1829, to locate on the land any donation claim, under the act of 24th May, 1828; which agreement was contained in two several instruments, both dated Jan. 21, 1839, and signed, one by Morse and Nicks, and the other by Nicks alone; the first of which authorized Nicks to locate the land, under certain stipulations, and the other was obligation for the payment to Morse, by Nicks, of $250, on the 15th of May, 1829, *upon the condition* that Nicks should so locate the land, and both constituting one entire agreement. That no such location was made by Nicks previous to May 15, 1829, and submitting that Nicks had no power to locate afterwards.

That, in the latter part of May, or early in June, 1829, Morse demanded of Nicks payment of the sum mentioned in the obligation, but Nicks refused to pay, because no location had been made, for want of surveys not returned to the land-office; upon which, Morse revoked his consent to the location, and demanded a return of his agreement, which Nicks refused, but consented to the revocation.

That after the revocation, Morse sold to Duval & Carns all his right, title, interest, and claim to the land, for $595, to him in hand paid; and that in October, 1829, they sent an agent to the Land-office at Batesville, to locate for them a donation claim on the land,

Nicks' Heirs et al. *vs.* Rector.

which the agent was prevented from doing by the land officers, on the ground that the written authority of Duval & Carns had not been acknowledged before a Justice of the Peace; which was not necessary, as the written authority had been attested by a witness, and by him proven; and that such were then the instructions from the General Land-office.

That, by the act of Congress of Jan. 6, 1829, in regard to such donation claims, it was provided, that any location of such a donation claim, upon any tract of land, except by the consent of the actual settler thereon, should be absolutely null and void. That, in October or November, 1829, while Duval & Carns were actual settlers on the land, in the exclusive possession and occupancy thereof, the sole and exclusive owners of the improvements thereon, and of all right, title, or claim to the land, against all the world except the United States, and when no other person was the occupant of the land, or any part of it, except as tenants of Duval & Carns, and at their sufferance, Nicks located the land, at the land-office at Batesville, with a donation claim granted to Andrew Matthews, and deposited, in his own name, in the General Land-Office, the requisite certificate of such location, to enable Nicks or his heirs, to obtain a patent for the land; and, that some time previous to May, 1831, a patent issued to Nicks, on the location. That the location was made without any consent from Duval & Carns, or either of them; that Nicks' consent had been revoked; and, if not, that the location was null and void, without the consent of Duval & Carns.

That, on the 16th April, 1832, Matthews executed his deed for the land, to the heirs of Nicks. That the location was made by Nicks, with a full knowledge that Duval & Carns were actual settlers, and with the deliberate intention of defrauding them, and depriving them of the rights vested in them by the act of Congress. That, in May, 1831, Duval went to the land-office in Batesville, and offered to the land officers there, the requisite proof to establish the right of preemption of Duval & Carns to the land, under the act of 1830; which proof they refused to receive, on the ground that the land had been previously located by Nicks. That then Duval made application for redress, at the General Land-office, from which instructions were sent,

directing the land officers, at Batesville, to take the proof which both the contending parties should furnish, in relation to the land, and to forward the same to the General Land-office. That, under these instructions, Duval & Carns established, by the legal and requisite proof, that they did occupy, improve, and cultivate the land, in 1829, and were in possession of it when the act of 1830 passed, and that, under said act, they were entitled to a pre-emption. A copy of the proof was exhibited.

That Nicks died in the latter part of 1831, or early in 1832, leaving two minor children, John Q. and Elizabeth P. Nicks, and a widow, Sarah P. Nicks, who has intermarried with Robert S. Gibson.

That, when Nicks' location was made, the land had not been offered for sale by the United States. That, after the proof of pre-emption had been so taken, Duval purchased of Carns all his interest in the land, improvements, and right of pre-emption, for which Carns executed a deed to him, on the 10th of December, 1832, for the sum of $500; and that, on the 4th of February, 1837, Duval sold and conveyed to Rector all his interest in the tract of land, and pre-emption right; and, that no person claims any title to the land, except the heirs of said Nicks, Gibson and his wife, and Rector.

That the heirs of Nicks have instituted an action of ejectment against Duval, tenant in possession under Rector, for the recovery of the land, and will succeed in evicting him, unless the arm of equity interpose.

Carns, Nicks' heirs, Gibson and wife, Matthews, and Duval, were made defendants; injunction prayed to stay proceedings at law, and a decree perpetually enjoining the heirs of Nicks from any action under the patent, and from asserting or setting up any claim to the land under the patent; and perpetually enjoining Gibson and wife from asserting any claim to, or instituting any proceeding for, dower; and finally quieting Rector's possession.

Exhibits A. and B. were the deeds of Morse, by which he sold to Duval & Carns.

Exhibit C. was the agreement between Morse and Nicks, by which Morse covenanted and agreed with Nicks, to permit, and gave him full power, to locate a donation claim on the land; and it was agreed

that the land should be divided between them in a certain manner. Dated Jan. 21, 1829.

Exhibit D. was Nicks' writing of the same date, in these words : " On or before the 15th day May next, I promise to pay, or cause to be paid, to Wm. Morse, two hundred and fifty dollars, for value received of him.

" The condition of the above obligation is such, that if I shall be able to secure, by donation, recently created by Cherokee Treaty, a patent to (describing the land), then the above obligation to be in full force; otherwise of none effect." Signed, " John Nicks"—but not sealed.

Exhibit E. was the deed from Matthews to Nicks' heirs.

Exhibit F. was the pre-emption proof, consisting of the affidavit of Duval, and the confirmatory affidavits of Curry Barnett and Matthew Moore, fully proving the right of Duval & Carns to a pre-emption, under the law of 1830, taken Nov. 18, 1831.

Exhibit G. was the deed from Carns to Duval; and Exhibit H., the deed from Duval to Rector. Exhibits A., B., C., D., G., and H., were the *originals*. Exhibits E. and F. were copies.

The injunction was obtained. Subpoena issued, and was served on all the defendants, except Matthews and Carns.

At September term, 1839, Gibson and wife answered. They stated, that Duval & Carns rented the log-house, as stated; that it was situated on, and made a part of, the improvement of Morse. They deny knowledge of the contract made by Morse, with Duval & Carns, and exhibits A. and B. They learned from rumor, that Duval & Carns had bought of Morse, and with a full knowledge of the previous purchase made by Nicks. That Nicks' purchase never was abandoned or revoked. That Duval & Carns, expecting the land to increase in value, persuaded Morse to get off from, or disregard, his contract with Nicks, and sell to them, and to go to Fort Gibson to rescind the contract. That he told Duval & Carns that Nicks had refused to abandon his contract, and that they bought with a full knowledge of these facts. That they knew that Nicks refused to rescind the contract, when Morse went to Fort Gibson, and told Morse

33

that he intended to perform his part of the contract, and that he (Morse) should perform his.

That Nicks' purchase was a bona fide one, for valuable consideration. That it was then commonly the case that donation claims were furnished, to be located on the shares; and the terms made with Morse by Nicks, were more liberal than usual. ·

Admit that Duval & Carns resided on the land, as stated: think it probable, but do not know, they made the improvements alleged, in 1829, but deny all knowledge and belief of any cultivation in that year. Admit exhibits C. and D. Deny that the power given by Morse to Nicks was limited to May 15, 1828. Nicks had no other power; but *that* power was absolute, unconditional, and gave him an interest in the land. Admit that the location made by Nicks was *after* the date mentioned in the bill.

Deny that Nicks was bound to pay Morse any thing, until after the location. Deny that Morse ever demanded money of Nicks. Nicks never stated to Morse that the money would not be paid, nor that the land could not be located, for want of surveys. Admit that he did not pay Morse, nor deliver him the agreement. Deny the demand of either money or exhibit D.; deny that Morse ever revoked, offered to revoke, or had power to revoke; deny any mutual agreement to revoke. Nicks always expressed his determination to locate, and to fulfil his agreement with Morse.

That Duval & Carns should have investigated the character of the claim they bought of Morse; that there was no fraud; that the facts stated in the bill do not, in law, constitute a revocation.

Admit that improvements of value have been made on the land by Duval & Carns, and continued by Rector, but know nothing as to their value. That the improvements are on the part of the land which would fall to Nicks, by the agreement between him and Morse. That Duval well knew this, and Nicks' claim to the land. That four-fifths of the improvements have been made since suit in ejectment commenced. That Rector knew of Nicks' claim when he purchased.

Deny knowledge of exhibits G. and H.; of the application of Duval and Carns to locate with a donation claim; and deny that they

had any right to locate such a claim.    Admit the death of Nicks; the character of the defendants; the patent to Matthews, and his deed.

That Duval & Carns did attempt to prove a pre-emption; but, whether the copy of proof exhibited is true, or whether they were entitled to a pre-emption, ignored.

That the land officers at Batesville refused to receive the proof, because it was insufficient, and because the land had been entered. That Duval & Carns appealed to the Commissioner of the General Land-office, who ordered the land officers at Batesville to notify Duval, Carns and Nicks to appear with their testimony, and that they should re-investigate the claim of Duval & Carns to a pre-emption. That notice was given to all, requiring them to appear and produce testimony; Duval & Carns, to prove their pre-emption; Nicks, to show cause why the pre-emption should not be allowed.    That Nicks did so, and made all the proof required, as to his right and claim to the land: That Duval & Carns did not appear, in obedience to the notice, or offer any proof of their right to a pre-emption, but wholly abandoned the same: That the location was confirmed, and a patent issued to Mathews: That Duval & Carns never afterwards attempted to establish their pre-emption, but wholly abandoned it.

That Gibson and wife have no claim to the land; but it belongs exclusively to Nicks' heirs.

The exhibits attached to the answer were the deed of Matthews and wife to Nicks' heirs, and the patent to Matthews and his heirs.

Upon filing this answer, the defendants moved to dissolve the injunction, and the complainant filed exceptions to the answer.    The exceptions were allowed, by consent.

The heirs then answered, by general denial.    Gibson and wife answered, further, that, to the best of their knowledge, Nicks entered the land in October, 1829, at which time Duval & Carns were actual settlers on the land; but, whether sole and exclusive occupants, ignored.    That Nicks bought half of Morse's interest in the land and improvements, and took his obligation, with full power to locate the same by a donation claim, as appears by exhibits C. and D. to original bill.    That, when Nicks bought, Duval & Carns had rented a storehouse of Morse, on the land, and were boarding with Morse, who was

then sole owner of all the improvements on the land.    That Duval &
Carns bought with knowledge of Nicks' purchase, and subject to his
interest and claim.    Deny that Duval & Carns were sole and ex-
clusive owners of all the improvements on the land, and of all right,
&c., in the land, against all the world except the United States;
and aver that, when Nicks located, he had ownership, right, &c., in
the land, as by exhibits C. and D. of the bill.

Admit Duval & Carns were occupants when it was located.
Whether any other person was occupant or resident, ignored.

To the answer of the heirs, by guardian Robert S. Gibson, and to
the original answer and amendment of Gibson and wife, the complain-
ant filed general replications.    Order of publication was then taken
against Carns and Matthews.    Duval filed his answer, admitting eve-
ry thing.    The complainant replied, and the case was continued.

At March Term, 1840, order of publication having been pub-
lished, a decree *pro confesso* was taken against Carns and Matthews.

In December, 1840, the complainant filed a supplemental bill, stat-
ing, that the value of the land is at least three thousand dollars.
That when Duval proved up his pre-emption at Batesville, and im-
mediately on such proof being made, he made formal application to
enter and purchase the land, and tendered the government price for
it, in such funds as were receivable at the land-office.    That the land
officers refused to permit the entry, and the Receiver refused to re-
ceive the money, on the ground that the land had previously been
entered.

The defendants, Gibson and wife, and Nicks's heirs, were ruled to
answer the supplemental bill.    Gibson and wife answered, admitting
the value of the land; but, as to the tender, &c., ignored.    The in-
fants denied, generally, and the complainants filed replications.

Samuel L. Griffith, who had intermarried with Elizabeth Q. Nicks,
was afterwards made a party, and the case was heard, and a final
decree rendered for the complainant, in conformity to the prayer of
the bill.

The evidence on which the case was heard, was as follows: James
Hervey's deposition stated, that he was well acquainted with Morse
and Nicks, in their lifetime.    That they were both dead.    That wit-

ness made the first improvement ever made on the land, in 1825. In 1826, he sold to Morse, and gave him possession, it being then public land. That Morse settled on the land, commenced living in the house which witness had erected, and continued to live on it until after January, 1829; and Nicks was living at Fort Gibson, west of the present State of Arkansas. That, in July, 1829, witness went with Morse from Fort Smith to Fort Gibson. Previous to going, Morse had bought a number of horses, for which he had not paid, and he went to Fort Gibson to get the money of Nicks, to pay for them. After their arrival, Morse told Nicks that he was bound to pay for the horses, and that he must have his money, or his place back, so that he could dispose of it to somebody else; and demanded of Nicks that he should either pay him the money, or give him back his bond. Nicks said he had no money, and added, "D—n the place! I don't believe I can save it with a donation claim." On the 29th of July, 1829, saw Morse receive from Duval a quantity of silver, amounting to from $200 to $250, out of which Morse paid, for the horses, $205. The money was paid in the store-house occupied by Duval. Duval & Carns took possession of the store-house in the fall of 1828, and had occupied it from that time until the 29th day of July, 1829; at which time (it being a double log building), they occupied one part as a store-room, and the other as a sleeping-room, and were boarding with Morse, who lived in another house on the same land. In 1829, Morse cultivated a field of corn on the land, and Duval & Carns cultivated a different place, of about an acre, in turnips and other vegetables, on the same tract, and built a new store-house, and sunk a well on it. They continued to live on the tract through the years 1829 and 1830; and thence up to this time, either Duval & Carns, or Duval alone, has resided on it, and Duval still resides on it. Duval & Carns were residing on, and actually occupying, it, on the 29th of May, 1830, and believes that, before then, Morse had removed and gone away from it. Henry Mahon died about six years ago. Nathan Barnett left this State, for Kentucky, about four years ago, and has never been heard of since, and is supposed to be dead. Thomas J. Duval is not now in this State. [*Mahon* and *Barnett* are witnesses to exhibit B.; *Mahon*

and *Duval* to Exhibit A]. Duval & Carns originally obtained possession of the store-house, by renting it from Morse.

The deposition of John Rogers stated, that Duval & Carns, late in the fall, thinks in December, 1828, settled upon the land. When they first came, they took possession of, and thence commenced to occupy as a store-house, a double log-cabin, on the land; had possession of the store-house in 1828, and through the year 1829. Did not know whether they rented it or not. They opened a stock of goods in it, and carried on merchandizing in it. Duval came on with his family, in 1829; thinks in the summer; certainly before the fall; and thence to the present time, he and his family have, without intermission, resided on the land. For a short time after they took possession of the store-house, Morse continued to live in one end of it, but soon moved below, into another house on the same tract. Morse cultivated a field of corn on it, in 1829, and Duval & Carns also cultivated a small place on the same tract, in the same year, in vegetables. In the summer of 1829, Duval & Carns built a new store-house, and Duval then occupied the old store-house as a dwelling-house. The piece of ground cultivated by Duval & Carns, was near the old store-house; and they, in the same year, dug a well near it. Late in the fall of 1829, but does not know whether it was before or after he gathered his crop, Morse moved away with his family from the tract, from which time to and on 29th May, 1830, Duval & Carns resided on it.

Has frequently seen John W. Flowers and John Nicks write. They are both dead. The signatures of " J. W. Flowers," and " John Nicks," to exhibit D., of the original, " which I have here now inspected," are the true signatures of Flowers and Nicks. [Flowers was the only subscribing witness]. Knew Henry Mahon and William Morse, who are both dead. Did not know Nathan Barnett. Has seen Mahon and Morse write. Mahon's signature to exhibit B. is genuine. Thinks Morse's signature to exhibit B. genuine. [Mahon and Barnett sole subscribing witnesses]. Signature of Henry Mahon to exhibit A. genuine. Thinks the signature of William Morse to same genuine. [Mahon and Thomas J. Duval sole witnesses]. Is acquainted with J. H. Rose, G. W. Brand, and Peter A. Carns. [Rose and Brand sole subscribing witnesses, and

Carns grantor, to and in exhibit G]. "They are all now beyond the limits of this State." Their signatures to exhibit G. genuine.

Has seen Elias Rector write. [Complainant and sole witness to exhibit H]. Signature to exhibit H. genuine.

The land was never offered for sale by the United States, until the year 1830. The lands adjoining first offered in 1831. Land worth $3000.

The deposition of Curry Barnett proved the renting of the log-house, the residence of Duval & Carns, through 1829 and 1830, and afterwards; the cultivation by Morse in 1829; *that Morse removed* some time in the fall of 1829—as he believes, in September or October; that since then, Duval & Carns, or Duval alone, have constantly occupied it; clearing land, digging well, building house, and cultivation by Duval & Carns in 1829; that in October, 1829, *after Morse had removed, and ceased to occupy the land,* Duval & Carns purchased a donation claim, and employed witness to go to Batesville, and locate the land with it, for them. Witness went there, in October, 1829, and made application to locate the land with it. Col. Boswell, Register, was satisfied with the power of attorney, and Mr. Redmon, Receiver, was not, and would not consent to the entry. Witness returned, and Duval & Carns then gave him another power of attorney to locate the land, acknowledged before a Justice of the Peace. Witness then went again, and the officers informed him that the land had been located the day before by Nicks. At the time when Nicks made his location, Morse had ceased to reside on the land, and Duval & Carns were the sole occupants of it.

In the spring of 1831, witness went to the land-office, with William Duval and Adam Carnahan, to prove up Duval & Carns' pre-emption. The Receiver refused to hear the proof. Then in the fall of 1831, witness again returned, with Duval and Matthew Moose, and the proof was then received.

The deposition of Matthew Moose stated, that in the fall or winter of 1828, Duval & Carns were living on the land, and continued so to live on it until 1832, when Carns removed. Duval continued to live there until the overflow in June, 1833, when he went away for a short time, but returned in the fall or winter of 1833, and has lived

there ever since. In 1829, Duval & Carns built a house on it, cleared land, cultivated it, and dug a well. Morse removed early in the fall of 1829, and from that time until 1832, Duval & Carns were the sole occupants. In the fall of 1831, witness went with Duval & Barnett to Batesville, as a witness, to prove the pre-emption of Duval & Carns, when his affidavit was taken.

The complainants then read a transcript from the General Land-office, duly authenticated, containing copies, first, of a letter from the Commissioner of the General Land-office to the land officers at Batesville, dated 12th August, 1831, in which he transmitted certain evidence filed in the General Land-office by Duval & Carns, and stated, that agreeably to their representations, and accompanying affidavits, the act of January, 1829, directly prohibited the location of the land by Nicks, in consequence of its being occupied, and the occupants having given no consent. He therefore required them to report on the facts in the case to the General Land-office, as soon as practicable, and permit Duval & Carns to file such further and additional testimony as they might have to adduce, and to return the accompanying papers to the General Land-office.

*Second*—Of the response of the land officers, stating that they had notified the parties, and after receiving proof, would forward a report. Dated December 8, 1831.

*Third*—Of letter from Batesville land-officers, dated 5th December, 1831, enclosing a certified copy of all the papers on file, and stating that Nicks had permission from Wm. Morse to locate.

*Fourth*—Copies of the affidavits forwarded to the Commissioner, to which he referred in his first letter; being the affidavit of Duval, that he and Carns made a permanent settlement in 1829, in January, and cleared land, sowed turnips, built a house, and sunk a well, in 1829, and thence continued in possession until the date of the affidavits, 6th June, 1831. The affidavit of Adam Carnahan and Curry Barnett, that the facts stated in Duval's affidavit are true. The affidavit of Adam Carnahan and Curry Barnett, that on the 28th of May, 1829, Duval offered testimony as to the pre-emption right of Duval & Carns, at the Land-office at Batesville, which the officers refused to hear, because the land had been already located by Nicks;

and that Duval then tendered the price; and the affidavit of Curry Barnett, that in the fall of 1829, he went to Batesville, for Duval & Carns, to locate the land with a donation claim, which was refused, because the power of attorney from Duval & Carns to him was not acknowledged before a Justice of the Peace.

*Fifth*—A power from Morse to Nicks, of the same date, (January 21, 1829), as the papers connected with the same transaction, marked as exhibits C. and D., authorizing Nicks to locate the land. Proven before a Justice of the Peace.

*Sixth*—A protest by Nicks, addressed to the land-officers at Batesville, February 28, 1829, against any person locating the land " by virtue of my improvement, which can be made more fully to appear by evidence which I am ready to adduce;" with the affidavit of George C. Pickett, of same date, as to *Morse's* improvement; and a power from Matthews to locate his donation claim, proven by a subscribing witness.

*Seventh*—The affidavit of Preserved Morse, son of William Morse, taken October 7, 1831, that Morse and Nicks made the agreement aforesaid; that when this agreement was made, all the improvements on the land had been made by Morse, and Duval & Carns had only rented the store-house for one year, to expire 31st December, 1829; and if they cultivated, it was done under that lease.

*Eighth*—The pre-emption proof of Duval & Carns, being the affidavits of Duval, and of Curry Barnett and Matthew Moose, taken November 18, 1831, before the Register and Receiver at Batesville, proving all the facts, as to their occupancy, possession, and cultivation, in 1829, and their possession in 1830, and ever after they purchased of Morse, in July, 1829. The affidavit of Barnett further proves his attempt to locate with a donation claim.

*Ninth*—Of a letter from the Commissioner to the Register and Receiver at Batesville, dated blank, informing them that he had received their letter of the 5th December, 1831, covering copies as above stated; that the act of 6th January, 1829, required that the consent of the *actual* settlers should be obtained before a donation claim could be located; that whether such actual settlers were tenants or original settlers, was not a question arising under the act; that Duval &

34

Carns *were* the actual settlers, and their consent was necessary to the legal location of the donation claim of Matthews; but as the patent had issued to Matthews, the only redress of Duval & Carns would be in the courts of Arkansas, to whose decision they might appeal; the equity jurisdiction thereof being competent to the most ample relief in the case.

*Tenth*—Of the President's proclamation, dated 25th March, 1831, offering for sale the adjacent lands, on the 1st Monday of July, then next ensuing.

*Eleventh*—Of certificate of land-officers at Batesville, that Matthews' donation was located on the 19th November, 1829.

The complainant then read his several exhibits. The defendants offered no evidence, except the two exhibits to the answer of Gibson and wife.

In regard to the evidence, the following questions arose, and were brought before this Court by the appeal:

*First*—When the complainant offered to read the deposition of John Rogers, the defendant objected to reading that part of it which referred to the exhibits in the bill, because the exhibits were not annexed to, and made a part of, the depositions; the *original* exhibits being annexed to the bill. The motion was overruled, and defendants excepted.

*Second*—They then objected to reading the depositions of Rogers and Hervey, because the direction in the commission under which they were taken, was in blank, thus: " The State of Arkansas to ———, greeting." The Court overruled the objection; and the complainant then moved to amend the commission, by inserting the words, " to any Judge or Justice of the Peace in any of the United States;" which was granted, and the commission amended. To all this the defendants excepted.

*Third*—The defendants objected to reading the transcript from the General Land-office, because the certificate was insufficient, (it being in these words: " I, James Whitcomb, Commissioner of the General Land-office, do hereby certify, that the foregoing fourteen pages and one-half, are truly copied from the records and files in this office." The caption being, " General Land-office, June 15th,

Nicks' Heirs et al. vs. Rector.

1841;" and the attestation, "In testimony whereof, I have hereunto set my name, and caused the seal of said office to be hereunto affixed, the day and date above written." Signed, "Jas. Whitcomb, Commissioner," and sealed with the seal of the General Land-office of the United States). Because much of the transcript did not relate to the issue; and because many of the letters bear no signature. These objections were overruled, and the defendants excepted.

*Fourth*—The defendants objected to reading exhibit B. of the bill, upon the proof of its execution contained in the depositions of John Rogers and James Hervey. It will be recollected that exhibit B. was the deed from Morse to Duval & Carns, attested by Henry Mahon and Nathan Barnett. Hervey said, in his deposition, "Henry Mahon died about six years ago. Nathan Barnett left this State, for Kentucky, about four years ago, and has never been heard of since, and is supposed to be dead." Rogers said, in his deposition, " I was acquainted with Henry Mahon and William Morse. They are both dead. I was not acquainted with Nathan Barnett." He then proved the signatures of Mahon and Morse. The objection was overruled, and defendants excepted.

Complainants then offered to prove exhibit H. viva voce, at the hearing, (no order therefor having been obtained, or notice given), by Matthew Moose, subscribing witness. The defendants objected, but the Court overruled the objection, and allowed the proof; and they excepted.

The defendants then objected to reading exhibit F., [which was a copy of Duval & Carns' pre-emption evidence, corresponding exactly with that contained in his transcript from the General Land-office]. The objection was overruled, and the defendants excepted.

The defendants then objected to the reading of exhibit A., as proven by the depositions of John Rogers and James Hervey. This was Morse's deed, witnessed by Henry Mahon and Thomas J. Duval. Hervey said, in his deposition, " Thomas J. Duval is not now in this State;" and Rogers, in his deposition, taken at the same time, proved Mahon's death, and the signature of Mahon and Morse. The objection was overruled, and the defendants excepted.

The defendants, after decree entered. moved the Court to set it

aside, because it was for the complainant, when it should be for the defendants—because it was rendered without sufficient evidence, and contrary to equity—and because illegal and impertinent evidence was admitted. The motion was overruled, and the defendants excepted, referring in their bill of exceptions to all the evidence, and appealed.

The case was argued in this Court by *D. Walker* and *Paschal*, for the appellants, by written arguments, not allowed, by the rule of the Court, to be published.

*Pike, Trapnall & Cocke*, contra.

Permitting a deed, which was an exhibit, attached to the bill, to be proven viva voce, at the hearing, without previous order or notice, was a proper exercise of discretion by the Court below, and cannot be reviewed on appeal. Our statute in regard to the manner of taking testimony in cases in Chancery, instead of restricting the Chancellor, enlarges the discretion allowed in England.

The English rule was, that some matters might be proved by a viva voce examination, at the hearing: such as deeds, writings, or other documents, which might be proved on production, without entering on any examination which would admit of a cross-examination. In the case of a will, this mode of proof at the hearing was not permitted, because the *due* execution might come in question, which could not be examined to *ore tenus*, at the hearing of the cause; neither was this evidence admitted to prove witness's hands, who were dead; but the Court itself had a right, whenever it saw fit, to examine *viva voce;* and, in the case of an exhibit, attempted to be proved at the hearing, the Court would examine viva voce, on the suggestion of any question. The English practice further was, that, to authorize the proof of any exhibit viva voce on the hearing, an order to that purpose was to be previously obtained, *which was granted, of course*, and a copy of the order was to be served, two days previous to the hearing of the cause, upon the adverse clerk in Court. 1 *Newland's Ch. Pr.* 284. 2 *Maddock's Ch. Pr.* 426, 427. 1 *Smith's Ch. Pr.* 414. *Graves vs. Budgell*, 1 *Atk.* 444. *Walker vs. Symonds*, cited 1 *Mer.* 37. *Pomfret*

Nicks' Heirs et al. *vs.* Rector.

*vs. Windsor*, 2 *Ves. Sr.* 479. *Eade vs. Lingood*, 1 *Atk.* 203. *Turner vs. Burleigh*, 17 *Ves.* 354. *Banks vs. Farques*, *Amb.* 145.

·An English Chancellor, where the evidence proposed to be given related only to the proof of a document; where no undue advantage could accrue to the plaintiff, nor any surprise happen to the defendant; where the defendant knew the document was to be proved; where the proof was not to let in some new matter, and the defect had not happened through design, but by a mere slip, would allow a re-examination, even after the case had come to a hearing. *Cox vs. Allingham*, 1 *Jacob* 337. *Lake vs. Skinner*, 1 *Jac. & Walk.* 9. *Chervet vs. Jones*, 6 *Madd.* 267.

In New-York, the regular practice established by the Courts is, to allow the proof, on *notice*, served four days before the hearing; and the courts there have gone so far as to allow papers and writings of every description to be proved viva voce, at the hearing, , and the witnesses to be cross-examined, at the discretion, and under the direction, of the Court. It is treated by them as wholly a matter of discretion, and they have dispensed with the notice, whenever it could be done without surprise. *Consequa vs. Fanning*, 2 *J. C. R.* 481. *Barrow vs. Rhinelander*, 1 *J. C. R.* 559. *Desplaces vs. Goris*, 5 *Paige*, 252. *S. C.* 2 *Edw.* 423. *Pardee vs. DeCala*, 7 *Paige*, 134. See also, *Higgins vs. Mills*, 5 *Russ.* 287. *Cartwright vs. Cartwright*, *Dick.* 215. *Barnes vs. Lee*, 1 *Bibb*, 528. *Hughes vs. Phelps*, 3 *Bibb*, 199. *Crist vs. Brashiers*, 3 *Marsh.* 171. *March vs. Walker, Finch*, 416. *Bishop vs. Church*, 2 *Ves. Sr.* 105.

And this is a mere matter of practice, which the Circuit Court had the power to settle for itself. The practice shifts, from time to time, to meet the new exigencies of society, and the pressure of peculiar circumstances; and a court of equity never suffers itself to be entrapped by its own rules, so as to interfere with the purposes of substantial justice. *Poor vs. Carleton*, 3 *Sumn.* 76. *Smith vs. Babcock*, 3 *Sumn.* 588. *Raymond vs. Simonson*, 4 *Blackf.* 80.

That the Court permitted the amendment of the commission, is *too frivolous*, even in its character of an objection to form, to merit refutation. *Mobley vs. Hamit*, 1 *Marsh.* 590. *Winthrop vs. Union Ins. Co.*,

Nicks' Heirs et al. vs. Rector.

2 Wash. C. C. R. 7. Coleman's Cas. 55. Cooke vs. Gibbs, 3 Mass. 195. Prescott vs. Tufts, 7 Mass. 209. Ripley vs. Warren, 2 Pick. 591.

Matters of practice, or resting on discretion, cannot be reviewed, on appeal. Rogers vs. Hosack's Ex'rs, 18 Wend. 319. People vs. Rector, 19 Wend. 569. Rowley vs. Van Benthuysen, 16 Wend. 369. Armstrong vs. Wright, 1 Hawks. 93. Mandeville vs. Wilson, 1 Cranch, 15. Wyman vs. Dorr, 3 Greenl. 183. Clap vs. Balch, 3 Greenl. 216. Foster vs. Haines, 1 Shepley, 307.

Positive evidence that the subscribing witness was not then in the State, was sufficient to admit evidence of his hand-writing. Brown vs. Hicks, 1 Ark. 242. Wilson vs. Royston, 2 Ark. 315. Jackson vs. Gager, 5 Cowen, 385. Jackson vs. Cody, 9 Cowen, 149. Jackson vs. Chamberlain, 8 Wend. 620. Pelletreau vs. Jackson, 11 Wend. 123. McPherson vs. Rathbone, 11 Wend. 96. Jackson vs. Waldron, 13 Wend. 178. Russel vs. Coffin, 8 Pick. 143. Van Dyne vs. Thayer, 19 Wend. 162. Emery vs. Twombly, 5 Shepley, 65. And these cases show that proof that another witness had gone to Kentucky, four years before, had never been heard of since, and was supposed to be dead, was also sufficient.

That the exhibits should have been attached to the depositions, is an objection that requires no notice. They were attached to the bill, part of the files of the Court, and so identified.

The transcript under the seal of the General Land-office, was properly read. Pardee vs. De Cala, 7 Paige, 134. Pacific Ins. Co. vs. Catlett, 4 Wend. 75. Tuttle vs. Jackson, 6 Wend. 213. Harris vs. Doe, 4 Blackf. 372. U. S. vs. Benner, Bald. 234. U. S. vs. Willard, 1 Paine, 539. Bleecker vs. Bond, 3 Wash. C. C. R. 529. Smith vs. U. S. 5 Peters, 292. Peck vs. Farrington, 0 Wend. 41. Catlett vs. Pacific Ins. Co., 1 Wend. 561.

Is a paper, referred to, but not copied or incorporated, in a bill of exceptions, a part of the record? Maulding vs. Rigby, 4 Howard, 222. Carmichael vs. Browder, 4 Howard, 431.

The donation claim of Matthews was located on the land when Duval & Carns were the only actual settlers on it, having lived on it nearly a year, when they had cultivated and built on it, and before it was offered for sale.

Nicks' Heirs et al. vs. Rector.

It is a matter of no importance whether Morse's license was limited as to time, and expired on the 15th of May, 1829, or not, or whether it was revocable or not. Duval & Carns were actual settlers on the land, and the location, without their consent, was null and void, by the condition attached by law to the grant.

Morse had no *interest* in the land. He was a mere trespasser. *Land Laws*, *vol.* 1, *pp.* 509, 551, 677, 716, 735. Instructions and opinions, published by order of the Senate of the United States, in 1838, *pp.* 1, 16, 181. *Smith vs. Rankin*, 4 *Yerger*, 1.

Duval & Carns had as much right to settle on the land, as Nicks had. They could not be his tenants, nor could they hold under him, or buy of him any thing in the land. The original agreement under which they entered, was not a lease, but a mere license to enter, and guaranteed them against any disturbance by him, without conferring on them a solitary right. He had no right which he could confer.

If there could be a tenancy, Morse's conveyance to them would have vested his estate in them immediately, and made him their tenant.

The instrument executed by Morse and Nicks, and Nicks' note of the same date, form one contract. When a transaction is evidenced by two papers, the connection between which is evidenced from their contents alone, without any necessity of a reference to parol evidence to make out that connection, they are considered, in law, as constituting one agreement. *Freeport vs. Bartol*, 3 *Greenl.* 340. *Boydell vs. Drummond*, 11 *East*, 150. *Chitty on Contr.* 23. *Redhead vs. Cator*, 4 *Camp.* 188, S. C. 1 *Bing.* 9, 196.

Nicks had power to extinguish the obligation of his note, by postponing the location until after the day specified. Upon the ground, therefore, of mutuality, and that mutual promises must be alike obligatory on each party, if he failed to make the location by the day, he could not afterwards make it. A court of equity will never decree performance where the remedy is not mutual, or where one party only is bound by the agreement. *Parkhurst vs. Van Cortlandt*, 1 *J. C. R.* 282. *Benedict vs. Lynch*, 1 *J. C. R.* 373. *Troughton vs. Troughton*, 1 *Ves.* 86. *Bromley vs. Jefferies*, 2 *Vern.* 415. *Lawrenson vs. Butler*, 1 *Scho. & Lef.* 13.

Nicks' Heirs et al. *vs.* Rector.

The agreement did' not give Nicks a power coupled with an interest. The clause in the act of 6th January, 1829, afforded a mere personal protection to Morse, in his character of settler. It created no interest or right in the land which he could convey, nor any personal privilege even which he could bestow on another, but a mere negative exemption and immunity, which he could waive. It was nothing that was transferable or assignable.

His consent to the location might amount to a personal covenant that he would not impeach it, and so operate by way of estoppel; but it would be a mere *personal* covenant, and could convey or create no interest or power; nor could it be of any avail after he should leave the land. His leaving it might be a breach of covenant.

The interest which can protect a power after the death of the person who creates it, or which is irrevocable, must be an interest in the thing itself. · The power must be *engrafted* on an estate in the thing. A power *coupled* with an interest, is a power which accompanies, or is connected with, an interest. The power and the interest are united in the same person. *This interest is not an interest in that* which is to be produced by the exercise of the power, for then they are never united. The power to produce the interest must be exercised, and, by its exercise, is extinguished. The power ceases when the interest commences, and therefore cannot be said to be *coupled* with it. *Hunt vs. Rousmaniere,* 8 *Wheat.* 74. *S. C.* 1 *Pet.* 1. *Story on Agency,* 155, 495.

The interest here was to be produced, if there was any power, by the exercise of the power. There was no power, but a mere waiver of an exemption. The word *power*, in this connection, means an authority to do some act connected with an existing estate.

Here was no agency. The act was not to be done for Morse, nor in his name. It was a mere license to Nicks, to do an independent act.

On the ground of agency, the same result follows. An agency is revoked by operation of law, in many cases, by a change of condition or of state, producing an incapacity of either party. The derivative authority expires with the original authority from which it proceeds. *Story on Agency,* 500, 521. When Morse left the land, his power to consent to its location ceased.

Nicks' Heirs et al. vs. Rector.

The refusal of the Register and Receiver to permit Duval & Carns to enter the land, is not conclusive. Power is given these officers, by the act of May 24, 1828, to adjudicate on the facts of settlement in, and removal from, the country ceded to the Cherokees. As to these matters, their decision was conclusive, in the absence of fraud. If they undertook to decide that Duval & Carns were not actual settlers on the land, or that it was legally subject to location by the donation claim, they were deciding a matter entirely beyond their jurisdiction. *Wilcox vs. Jackson*, 13 *Peters*, 490.

Duval & Carns proved a valid pre-emption right. To this point, the evidence is ample. See *Ins. & Op.* 97, 529, 108. This gave them a sufficient interest in the land, which they could transfer or convey, to entitle them, or their assignee, to have their possession quieted. *Ins. & Op.* 16, 59, 112. Even an entry and purchase, by a *bona fide* purchaser, would not be good against their claim. *Ins. & Op.* 60, 553, 613.

The tender was sufficient. If the debtor is prepared, and offers, to produce the money, and its production is expressly dispensed with by the creditor, it is complete and valid, without actual tender. *Chitty on Contr.* 305, 306. *Douglas vs. Patrick*, 3 *T. R.* 683. *Read vs. Goldring*, 2 *M. & S.* 86. *Braynard vs. Fisher*, 6 *Pick.* 355. *Thomas vs. Evans*, 10 *East*, 101. *Kraus vs. Arnold*, 7 *Moore*, 59. *Dunham vs. Jackson*, 6 *Wend.* 22.

Bank notes are a good tender, unless specially objected to on that account. *Snow vs. Perry*, 9 *Pick.* 539. *Wright vs. Reed*, 3 *T. R.* 554.

The same principles apply in the General Land-office, to cases arising under the land laws. *Ins. & Op.* 118.

The jurisdiction is clear. Where the Legislature declares certain instruments illegal and void, as the British annuity act does, or as the gaming acts do, there is inherent, in the courts of equity, a jurisdiction to order them to be delivered up, and thereby give effect to the policy of the Legislature. So to cancel a patent, declared by the Legislature to be void. *Clark vs. Smith*, 13 *Peters*, 195. *Underhill vs. Harwood*, 10 *Ves.* 218. *Byne vs. Vivian*, 5 *Ves.* 604. 2 *Yerger*, 524.

The sales of Carns to Duval, and of Duval to Rector, were subsequent to the passage of the act of Congress of 23d January, 1832,

which legalized the assignment of pre-emption rights, by those who had previously purchased. Rector's rights cannot be defeated, because Duval & Carns were prevented from purchasing by the fraud of a third party, or the dereliction of duty and negligence of the officers of the government.

*By the Court*, LACY, J. (The Chief Justice not sitting in the case).

The complainant in this case sets up title to the land described in his bill, as the legal owner of a pre-emption right of Duval & Carns, under the act of Congress of 29th of May, 1830, which was rejected, and the entry refused by the Register and Receiver of the Land-office at Batesville, by reason of a prior fraudulent location of the same land, by John Nicks, made by virtue of a donation claim, granted to Andrew Matthews, upon which a patent had issued, and conveyed by Matthews in fee to the heirs of Nicks. The respondents claim under the location of the ancestor, which, they say, was made in good faith, and under an authority given to him in his lifetime, by William Morse, the actual settler upon the premises, and, therefore, their patent rightfully issued, and they are entitled to possession under it. The bill prays to enjoin Nicks' heirs from instituting any proceeding under the patent, and Gibson and wife from setting up any claim of dower, perpetually quieting the possession of the complainant, and that of Duval, who holds under him. The decree affords the relief prayed for; to reverse which, an appeal has been taken to this Court.

Before we proceed to an investigation and decision of the several important questions that arise in this case, we will first notice and determine a number of minor points, that were raised upon the hearing, and insisted upon here.

These relate, principally, to matters of practice, and, as such, may readily be disposed of in a few words. The objection to filling up the blank in the commission, by the insertion of the words, "to any Justice of the Peace," that the exhibits were not annexed to the depositions proving them, and to establishing the exhibit of the deed from Duval to Rector, viva voce, without notice or a previous

order, all of which points the Chancellor overruled at the hearing, we regard as mere matters of practice, clearly within the exercise of his discretion. And this being the case, if there was any error or mistake committed, it cannot be taken advantage of in this Court upon appeal, especially when these questions do not enter seriously into the merits of the decree. The authorities are clear and express upon the point, that much allowance must be made for infirmity and errors upon mere rules of practice, falling within the equitable exercise of his authority. And this Court is not authorized to reverse a decree upon mere questions of practice, unless the Chancellor has expressly violated some important principle of equitable jurisprudence, or disregarded some plain and authoritative, command of the statute upon that subject. In the present instance, we perceive no such violation of principle, or disregard of any positive injunction. This rule is all-important for the government of our systems of chancery practice, and, without its enforcement, it would be impossible for the Chancellor to proceed with the business of the Court. The rigid application of the rules of English practice to our courts would, in many cases, be wholly impracticable, and, if allowed, would work most manifest injustice and wrong. The Chancellor, upon the hearing, unquestionably possessed the power to cause the blank in the commission to be filled up. For the commission is certainly nothing more than the process of the Court, which may, at any time, be amended upon suggestion, in an unimportant point. The provision in our statute, requiring the exhibits to be attached to the depositions, and to be sealed up, and returned with them, was only intended for greater certainty and security in proving them, and does not, in our opinion, apply to a case where the exhibits are made a part of the bill, and filed with it. The design and object of the law are certainly answered, if the exhibits are shown to the witnesses, and they are iden_ tified. And upon no principle of fair construction, can a party be required to take them from the rolls, for the useless purpose of attaching them to the depositions; nor would it be proper to allow it. All the statute requires is, that the exhibits should be identified, and their execution proved.

That clause in the statute regulating the proceedings in chancery,

that requires the testimony of witnesses to be taken in writing, unless otherwise directed by the Court upon the hearing, so far from denying to the Chancellor the right of causing an exhibit to be proved *viva voce* upon the trial, expressly gives him authority to do so, provided, in the exercise of his discretion, he does not take the party by surprise, or commit any serious wrong. In the present case, the exhibit proved *viva voce* upon the hearing, was filed with the bill, and there can be no pretence that those who wished to controvert it, had not a fair opportunity afforded them of questioning its genuineness. It is surely a more regular practice, and one more consonant with the principles of equity, to prove the exhibits before the examiner. It is likewise usual, where an exhibit is proved *viva voce*, first to obtain an order, *ex parte*, accurately describing it, and giving four days' notice before the hearing; but this rule has been changed, and a reasonable notice, instead of an order, is now substituted in its stead. And there are many cases to be found, where both the order and notice have been dispensed with, upon the ground, that no injustice was done by permitting the exhibit to be proved *viva voce* upon the hearing. And in the case of *Desplaces vs. Goris, 5 Paige Rep.* 252, Chancellor WALWORTH said, in a case where a written agreement was proved upon the hearing *viva voce*, and that, too, where no notice or order was had; " that there was no pretence, on the part of either of the defendants, that they had any reason to believe that the agreement was not in fact executed, or that the translation, as stated in the bill, was incorrect; that the only effect of denying the application would be, to subject the parties to the delay of a new suit, as it would, under the circumstances, be a matter of course to permit the bill to be dismissed without prejudice." In that case, the objection, that the the agreement was not sufficiently proven, was taken after the plaintiff's counsel had closed the opening argument, and the defendant's counsel had responded. And in *Poor vs. Carleton, 3 Sumner,* 76, Justice STORY well remarks, " there are numerous cases which show the gradual mutation and changes, often silent, and almost imperceptible, which have been introduced into the practice of courts of equity, to obviate inconveniences, which experience has demonstrated, and to adapt the remedial justice of these courts to the new exigencies of

society." These remarks apply with peculiar force to our courts of chancery jurisdiction, which only sit once in six months, and then but for a limited period, with no rule days, and no opportunity afforded for taking the necessary and regular steps in the proceeding, which is happily the case in other chancery systems, better organized and more fortunately situated than our own. *Consequa vs. Fanning et al.* 2 *J. C. R.* 481; *Barrow vs. Rhinelander* 1 *J. C. R.* 551. But whether the decision of the Chancellor upon this point be right or wrong, we deem it immaterial. Regarding it, as we do, to be a mere question of practice, and within the discretion of the Court, there can be no advantage taken of it upon appeal. *Rogers vs. Hosack's Ex'r,* 18 *Wend.* 319. *Mandeville vs. Wilson,* 1 *Cranch,* 15. *The People vs. Rector,* 19 *Wend.* 569. *Prescott vs. Tufts,* 7 *Mass.* 209.

Another objection raised is, that the evidence of the hand-writing of Nathan Barnett, one of the witnesses to the conveyance of Morse to Duval & Carns, ought not to have been received, his absence not being sufficiently accounted for. The rule upon this subject is properly stated in the case of *Brown vs. Hicks,* 1 *Ark. Rep.* 232, and *Wilson vs. Royston,* 2 *Ark. Rep.* 315, and in the authorities there cited. The principles there established, fully authorize the Chancellor to receive secondary evidence of the hand-writing of the witness proving the execution of the agreement. It was proved, upon the trial, that four years ago, the witness had gone to the State of Kentucky, and that he was supposed to be dead, and nothing more heard of him. This proof is uncontradicted by any opposing evidence, and, certainly, according to all the adjudicated cases upon the point, the hand-writing of the witness may be proved. *Jackson vs. Gager,* 5 *Cow.* 385. *Jackson vs. Cody,* 9 *Cow.* 140. *Jackson vs. Waldron,* 13 *Wend.* 178.

It is contended, that the evidence offered under the certificate and seal of the commissioner of the General Land-office, was improperly received. It is said to contain irrelevant testimony, and the certificate not to be in due form of law. It may be, and probably is true, that a considerable portion of the matter contained in that record is not strict proof in the cause, but it surely will not be presumed that could have had any influence upon the mind of the Chancellor, in

determining the matter, or, that certain portions of the record being irrelevant, should exclude other portions, which were relevant and legal. The act of Congress organizing and establishing the land-office, makes all records, books, or papers, belonging to the office of the commissioner, authenticated under his signature, and the seal of his office, competent evidence in all cases in which the original record, books, or papers, could be evidence. *Gordon's Digest, p.* 320. It was evidently the design of Congress to place the seal of the office on the footing with seals of courts of record; and, consequently, the seal of the General Land-office, and the signature of the commissioner to copies of originals, required by law to be deposited in his office, *prima facie* prove themselves. *U. S. vs. Bonner,* 1 *Bald.* 236. *Bleecker vs. Bond,* 3 *Wash. C. C. R.* 529. *Smith vs. U. S.* 5 *Peters,* 229.

Having disposed of these preliminary points, we will now consider the main questions in the cause. The first inquiry is, what is the nature and character of the agreement entered into between Nicks and Morse? There are two agreements, evidencing the contract of the parties, and both executed on the same day, to wit: on the 21st of January, A. D. 1829. The first part of the contract is, a sale from Morse to Nicks, of his improvement, with an authority to locate the same by a donation claim; and when the land was thus secured, it was to be for the joint benefit of both, and to be divided according to the stipulations therein contained. This agreement was signed by both Morse and Nicks. The second part of the contract, which was signed by Nicks alone, was a note of hand, by which he bound himself to pay Morse two hundred and fifty-nine dollars, the price of the improvement, on or before 15th of May, A. D. 1829, containing this express stipulation: if he, Nicks, should secure, by a donation claim, a patent to the land on which the improvement was made, then the obligation was to be in full force, otherwise, it was to be of no effect.

It is clear that these two instruments are to be taken together, as constituting one entire contract. They both have relation to the same subject matter, and bear date of the same day. The rule of law upon the subject is, that when the transaction is evidenced by two papers, the connection between which is established by their

contents, without any necessity of referring to other matter to connect them together, they will be taken as one entire agreement. *Boydell vs. Drummond,* 11 *East.* 140. *Chitty on Con.* 23.

By one agreement, Morse gives authority to Nicks to locate the land by a donation claim, for their joint benefit, upon certain terms. By the other, Nicks was to pay the note only on the condition that the location should be made by a certain day. It was in the power of Nicks to defeat the payment of the note, by postponing the location. It was certainly not competent for Nicks to release himself from all liability, and to hold Morse bound by his license. In all covenants, there must be a mutuality of agreement upon the respective parties, to be obligatory. Should the time have elapsed for location, could Nicks have enforced the specific execution of the agreement against Morse? Certainly not. And it is equally as clear, that after that period, Morse could not have enforced the payment of the note by Nicks. A court of equity will never decree a specific performance, unless the remedies are mutal, or where one party only is bound by the agreement. Upon Nicks' failure to make the location upon the day fixed, the authority given to him expired, because he was not bound, beyond that day, to pay for the improvement. The terms of the contract bound the parties to the performance of their mutual agreements, upon a day certain; and both the license given to Nicks, to locate, and the obligation to pay the money, expired at that period, and at one and the same time.

The clause in the act of the 6th January, 1829, was a mere personal privilege, or protection, afforded by law to the actual settler, in the peaceful enjoyment and occupation of his improvement. The policy of the government upon this subject, has ever been, to protect the *bona fide* occupant of the soil against an unjust and unwarrantable intrusion. Hence, his improvement and settlement are secured to him; and this privilege has ever been guarded assiduously by courts of justice, unless it clearly appeared that the settler either waived his privilege, or had transferred his improvement and interest, *bona fide*, to another. If, by any means, the settler transferred this right or privilege, or signified his consent to the location, it would be a mere waiver of his right to his improvement and settlement;

and possibly a personal covenant that would bind him so long as he continued to reside on the land, and the agreement be made to operate by way of an equitable estoppel; and it probably could not be revoked, if its terms were absolute and unconditional. But it would be otherwise, where its terms were conditional, and limited to a particular time. Such an agreement would certainly be binding, so long as the actual settler remained upon, and continued in possession of, the land. But should he voluntarily abandon his possession, then his consent to such location would seem to us to be of no avail. The act of Congress certainly contemplated the consent of the actual settler upon the land; for it has so expressed it. It makes the location of a donation claim, without such consent, if the land had not been previously offered for sale, absolutely null and void. But it is contended, in behalf of the defendants, that the location by Nicks, in this instance, is taken out of the operation of the act of Congress of 6th of January, A. D. 1829, upon the ground, that the authority and license granted by Morse to make the location, was coupled with an interest, and, therefore, irrevocable. Justice Story, in his accurate and admirable treatise upon agency, page 495, says, "where a power or authority is coupled with an interest, or where it is given for a valuable consideration, or where it is a part of a security, there, unless there is an express stipulation that it shall be revocable, it is, from its own nature and character, in contemplation of law, irrevocable, whether expressed so on the face of the instrument conferring the authority, or not;" and he puts several cases by way of illustration—a power to levy a fine, as a part of a security to a creditor; letter of attorney to sell a ship, as a security upon a loan of money, and the like. This doctrine was fully considered and determined in the case of *Hunt vs. Rousmanier*, 8 *Wheaton*, 174, and the distinction between a mere power, and a power coupled with an interest, is there clearly defined. In that case, Chief Justice Marshall remarked: "It becomes necessary to inquire, what is meant by a power coupled with an interest? Is it an interest in the subject on which the power is to be exercised? Or is it an interest in that which is produced by the exercise of the power? We hold it to be clear, that the interest which can protect a power after the death of

the person who creates it, must be an interest in the thing itself. In other words, the power must be engrafted upon an estate in the thing. The power and the interest are united in the same person." In the present case, is the power here engrafted upon the estate in the land? Was not the estate in the land to be created by the exercise of the power? It certainly was. For by the exercise of the license or authority given to Nicks, to make the location, the land upon which the improvement was situated, was to be secured; and the interest in the estate, or thing, was by the entry to be produced, by the exercise of the power. This being the case, in the language of that Court, the power, to produce the interest, must be exercised, and by its exercise, it is extinguished. The power ceases when the interest commences, and, therefore, in the present case, there is no pretext whatever, that the license given to Nicks was a power coupled with an interest, or irrevocable.

Morse never constituted Nicks his agent. In making the location, Nicks acted for himself, and not for Morse, and this their agreement clearly shows. There are no equal equities established between Nicks and Duval & Carns. The principle, as to an equal subsisting equity, does not apply—that he who is prior in time, is first in right. Morse had neither a legal nor equitable estate in the land. He merely possessed an inchoate, or imperfect right to the possession of the improvement, against all the world, except the United States, and that only so long as he continued to reside upon it. In no respect can Morse or Duval & Carns be regarded as the tenants of Nicks. Nicks had neither a fee in the land, or a life estate in the freehold, or any kind of interest which would create the relation of landlord and tenant. Neither Morse, Duval, or Carns ever professed to hold under him, or derive any title whatever from Nicks' supposed interest. The proof unquestionably establishes the fact, that Morse applied to Nicks for the payment of his note, after it became due; that Nicks refused to pay, from some cause or other; and from that time forward, Morse considered the contract and treated it as dissolved. Upon Morse's failure to obtain the purchase money from Nicks, he immediately sold his improvement to Duval & Carns, for the sum of five hundred and ninety dollars, which they paid him the 29th June; and

36

upon the 29th July, A. D. 1829, they acquired all his right and title therein, by regular conveyance, executed in their behalf by Morse, and claimed to be the sole and exclusive owners of the improvement, and the actual settlers upon the land. Morse never set up any adversary claim, or disputed either their right of improvement or possession. He abandoned the entire occupancy to them in October of the same year, and moved off the premises, leaving them in the actual and quiet possession of the land, and its improvements. After their purchase, the proof shows they added other valuable improvements upon the land, and were in the cultivation, and actual and sole possession of it, when Nicks made his location in November, A. D. 1829; and that Duval has, for Carns and himself, and for himself individually, and for the present complainant, continued to reside on the same tract ever since, and now holds it in possession. In the view we have taken of this case, it matters not whether Duval & Carns had notice or not of Nicks' purchase from Morse; for, after his leave to locate had expired, Nicks had no interest whatever in the improvement. Shortly after Duval & Carns purchased from Morse, they applied to the proper land-office to secure their improvement, by a donation claim, before Nicks located the same; but their application was rejected, for a supposed informality in giving their consent to the location. It was after this, that Nicks located the land; and whether he was apprised or not, that Duval & Carns were the actual settlers on it, he made his location at his own election and peril, and he must abide the consequences. If they were settlers— and that they were, there can be no doubt—then, without obtaining their consent, (which is not pretended in this case), his location, being made before the land was offered for sale, by the express terms of the law, is declared to be held null and void. His authority to locate is a gratuity, on the part of the government, to the original claimant, whose rights he acquired, given upon express compliance with certain conditions contained in, and annexed to, the grant, one of which is, if the donation claim is laid on the improvement of an actual settler, where the land has not been offered for sale, then, and in that case, the location is in violation, and in fraud of the law creating the grant; and, of course, the patent that issued on the claim must be

held to be void. After Nicks had made his location, Duval & Carns applied to the proper land officers, to enter their pre-emption right, but their application was rejected, not upon the ground that they had no right of pre-emption, or that it was not a good and valid one, capable of being fully established; but on the ground that the land had been previously entered by Nicks, and that, therefore, they were deprived of the benefit of the act of Congress of 29th May, A. D. 1830. Now, it must be perfectly manifest, if Nicks' location was void, being in fraud of law, of course Duval & Carns' right of pre-emption was not annulled by such location. It is equally clear, if Duval and Carns were entitled to the right of pre-emption, they cannot, on any principle of law or equity, be deprived of that right, by the land officers refusing the entry. Upon the case being brought to the consideration of the Commissioner of the General Land-office, he directed the Register and Receiver to take the proof, and report the facts to the department, which was accordingly done.

The patent issued to Matthews, A. D. 1831, and Nicks has obtained a deed from the original claimant, and brought an action of ejectment against the tenant in possession; and it is now contended, in their behalf, that the decision of the Register and Receiver is final and conclusive between the parties; and that, whatever right of pre-emption Duval & Carns once had, it has now ceased to exist. It will be borne in mind, that the Register and Receiver never passed upon the validity or genuineness of Duval & Carns' pre-emption, but they merely refused their entry, because the land had been previously located by Nicks, with a donation claim. The proof taken before them unquestionably established, beyond all doubt, that Duval & Carns strictly and fully complied with all the requisites of the act of 29th of May, A. D. 1830, and, as settlers and occupants, they were entitled to the benefit of the act. It is true, that the decisions of the Register and Receiver are conclusive as to all matters properly within their jurisdiction, in the absence of fraud; for the act of Congress, for many purposes, makes them judicial officers, and gives them exclusive cognizance of a particular class of cases. But we apprehend that the case now under consideration does not fall within the enumeration. The Supreme Court of the United States, in the case of *Wilcox vs.*

*Jackson*, 13 *Pet.* 490, has laid down the whole doctrine upon this subject.

The pre-emption act of 29th May, 1830, provides that, prior to an entry being made, proof of settlement and improvement, to the satisfaction of the Register and Receiver of the district in which the lands claimed are situated, shall be taken, agreeably to the rules prescribed by the Commissioner of the General Land-office. Upon this grant of power to the Register and Receiver, the Supreme Court remarks, "that the decision of the officers, in the absence of fraud, would be conclusive, as to the facts that the applicant for the land was in possession, and of his cultivating the land during the preceding year, because these questions were directly submitted to them." But, says the Court, "if they undertake to grant pre-emptions to land upon which the law declares they shall not be granted, then they are acting upon a subject matter clearly not within their jurisdiction; as much so as if a court, whose jurisdiction was declared not to extend beyond a given sum, should attempt cognizance of a case beyond that sum." So the act of Congress, of the 24th of May, 1828, authorizes the Register and Receiver to take the proper testimony for the establishment of donation claims, according to the requisitions of the act. As to the facts of settlement and removal, agreeably to the provisions of the treaty, the decision of these officers is conclusive, because it appertains strictly to their jurisdiction. But when the Register and Receiver undertook to decide that Duval & Carns' improvement upon the land was legally subjected to a location by a donation claim, then they were deciding in a matter entirely beyond their jurisdiction. No power was given them by law, nor were they authorized or required by the instructions of the General Land-office, to allow an improvement of an actual settler to be located by a donation claim, without his consent. In regard to that matter, they had no jurisdiction. The person entering a donation claim, did so at his peril; and, if he located lands upon which there was an actual settler, without obtaining his consent, such location was null and void, and the settler is, in our opinion, relievable in equity. The entry of Nicks' location being void by law, of course the patent invests those claiming under it with no title.

The bill does not seek a decree for a title, nor does it pray to vacate the patent. It only asks, that the possession of the complainant shall remain undisturbed by a patent illegally issued, and palpably void—a patent procured by a grant of Congress, and yet obtained in express derogation of the condition annexed to the grant. Nicks' entry having been shown to be void, Duval & Carns, or their assignee, have the exclusive right of purchasing and holding the land. They have a vested, legal, and equitable right, equivalent to an interest in the land. Having tendered the purchase money to the government, to enter their pre-emption, their right becomes complete and fixed. Even an entry by a *bona fide* purchaser is not good against a valid pre-emption. The tender of payment in due time, and of the requisite amount, is sufficient, in ordinary cases, between individuals, to save the right of the parties making it. In cases of executory agreements, it will entitle him who made it, in a court of equity, to a specific performance of the contract. We take the same principle to hold good in cases arising under the land laws, between a settler and the government. The rule in regard to the sufficiency of a tender is, if a debtor offers to produce the money, and its production is dispensed with by the creditor, the tender is complete and valid, without being actually made. The tender, in this case, was sufficient, because the land officer refused to receive the money.

As to the jurisdiction of a court of equity in this case, we entertain no doubt. "Whenever the law declares certain instruments illegal and void, as the British annuity act does, or as the gaming acts do, there is inherent in the courts of equity, a jurisdiction to order them to be delivered up, and thereby give effect to the policy of the Legislature; and, if this was not the case, a party would have a right without a remedy, or clear equitable interest or title without any means for its protection or enforcement." *Clark vs. Smith,* 13 *Pet.,* in which this language is used, to show that equity may cancel a patent, declared, by the Legislature, to be void. 10 *Ves.* 218. 5 *Ves.* 604. 2 *Yerger,* 524.

It only remains to be shown, that Duval's assignment to Rector of his pre-emption right, under the act of 1830, is valid. The act, it is true, declares all assignments and transfers of the right of pre-emp-

tion, prior to the issuing of the patent, null and void; but, by a supplementary act of 23d January, 1832, it was enacted, that from and after its passage, all persons who have purchased under the act of 1830, may assign and transfer their certificates of purchase or final receipts, and patents may issue in the name of such assignee, any thing to the contrary notwithstanding. 2 *Land Laws*, 298. Carns did not sell his interest to Duval until after the passage of this act, to wit: in December, 1832, and Duval sold to Rector in 1837. At the time of neither sale, was the transaction contrary either to the policy or letter of the law; and, if a person whose pre-emption was allowed, could sell, certainly those who had only been prevented from purchasing, by the fraud of a third party, and the dereliction of duty and negligence of the officers of the United States, could have no less a right to dispose of their interest.

It seems to us, on a careful consideration of the whole case, that the complainant has amply shown, that he is entitled to the relief prayed for in his bill, and granted by the decree; and therefore it is ordered in all things to be affirmed.